in our fourth case United States versus Perez. Mr. Johnson? Mr. Johnson. Good afternoon, your honors. This case came about due to a traffic stop in 2018 in Union, North Carolina. The central issue in this case is whether or not the police conduct violated my client's constitutional rights. That would be the appellate. Your honors, this case began once an officer, Marcel, from the Monroe Police Department stopped the appellant's vehicle in Union County. And when he stopped the car, he purportedly stopped it due to a fictitious tag. We had a suppression hearing in this case where the main officers testified, and that testimony is pertinent to what really transpired. It really helped us And I think this case is very fact specific. And if you look at the facts, Detective Furr is one of the officers involved, Detective Hagler is another, and then you have Officer Marcel. These are the three main officers involved. And I'm going to use these three names in conjunction with explaining why we feel that my client's constitutional rights were violated. Specifically, Detective Furr, who was not present at the scene initially, before the traffic stop occurred, called for a backup or a K-9 to arrive at the scene. So what we have in Detective Furr's testimony, if the courts will review the transcript, is that Detective Furr already determined that he was going to stop the car and also already called a K-9 unit. When Officer Marcel stopped the car, he was asking during testimony why he was stopped the car, who informed him to stop the car, and he said that he received a call from Vice Narcotics, specifically Detective Hagler, to stop the vehicle. And then once he stops the vehicle, what was really incredible at the hearing, and I don't know if your honor's had a chance to take a look at the transcript, but what happened was Officer Marcel prepared a report where he included the driver's license. But what actually happened, once we showed the video, is that he never approached the driver's side, nor did he ask for any drivery credentials or registration. He actually sat at the rear. This is critical because in the beginning of the suppression hearing, the government's counsel acknowledged that the sole basis for the stop was the fictitious tax, the purported fictitious tax, and not anything dealing with a drug investigation or any suspicion of drug activity. So the sole purpose for the stop, as we have it, are fictitious tax. And so Officer Marcel, who's supposed to investigate the primary purpose of the stop, even if the court would consider this a rent stop, even though the government didn't proffer that, even in that context, you have a responsibility as an underlying investigative officer to not abandon the primary purpose for the stop. And in this case, by not engaging the officer, we would argue that Officer Marcel initially abandoned the purpose of the stop. It wasn't until four minutes into the stop that Detective Hagler approached Officer Marcel with the license. And just to be clear, Detective Hagler is the detective that approaches the driver's side. So the way it works, Officer Marcel stops the car. He gets out. He goes to the rear of the vehicle. Almost immediately, Detective Hagler is there on the scene and he approaches the driver's side. Detective Hagler, in his testimony, said some incredible things. He said that once he engaged the officer, he could not recall if he questioned the officer regarding the registration or the license plate. He did acknowledge that he obtained the driver's license. He then said he took the driver's license. He did not give it to Officer Marcel immediately. He took the driver's license back to his car where he can conduct a background check. When questioned further, he said he did not have a laptop in his car and that he had to call headquarters. When questioned further what information he got from headquarters, he said that he could not recall. So what happened here at this point, Detective Hagler takes the driver's license and gives it to Officer Marcel. And as he does so, he tells him, you can hear it on video that we did submit to the court that K-9s are on the way. And what we contend is that this is part of the engineering of a prolonged detention to allow the K-9 unit to arrive. We are already four or five minutes into the stop and we are just beginning to look at the driver's license. Because at this point, Officer Marcel takes the driver's license to his vehicle and then he begins to look at the database. What's more telling is that during the next several minutes, Detective Hagler and other officers engage Officer Marcel while he's in his car and ask, do you need anything else? Do you need anything else to help you with this investigation? He repeatedly says no. And he was questioned about this at the suppression hearing and on the cross-examination. And when asked why he did not ask or request all the items simultaneously, he said that he wanted to conduct the investigation. He wanted to do it his way. And when questioned further, he said the line that he's not a multitasker. He needed to do, he couldn't receive the information, specifically the VIN number, while at the same time looking into the computer database. What we find, if you look at the timeline, about seven minutes and 46 seconds into the stop, Officer Marcel determines that the driver has a revoked license. We go on for several more minutes going into the 13th minute before the VIN number is even provided, which was the primary purpose of the stop. And then once that's investigated, it's determined that the car is properly registered, that there is a license plate actually belonging to the car to an actual owner, and that that license plate was valid until August of 2018, which was after the incident occurred. So what the gist of our argument was, if you look at the number of case law beginning with Rodriguez versus the United States and his progeny, especially here in the Fourth Circuit, what you see is an impermissibly prolonged detention to allow K-9s to arrive is unconstitutional, so long as the primary purpose is not fulfilled or unreasonably delayed. We contend that the investigation into the tags, that investigation was unreasonably delayed, given the fact that it didn't even begin until many minutes after the stop occurred. Your Honors, I would point out that in many of the cases in the Fourth Circuit dealing with this very specific issue, prolonged detention, courts have said that independent basis can arise that would allow for a prolonged detention under reasonable suspicion, such as knowledge of ongoing drug activity, such as furtive movements, such as the odor of marijuana or narcotics. Your Honors, in this case, the record is clear. There were no observations of furtive movements, nervousness, danger, or fear of being harmed. In fact, there was nothing in the record whatsoever as it pertained to any independent basis for reasonable suspicion. Mr. Johnson, could I ask, so is it your argument that at the four-minute mark that that was too long? I mean, how long was too long in this case? Because by the time the K-9 came and it sniffed the car, I think there were maybe 17 or 18 minutes into the stop, which in the abstract doesn't seem like a long time compared to other stops. So is there a particular line of demarcation that you say was unreasonable, or is it just the entirety of the stop? I think it's the entirety of the stop. But to go back to the four-minute mark, imagine being stopped by a police officer and not being asked immediately to provide your driver's license and registration. Even the trial judge remarked that it is commonplace that when a stop happens, a traffic stop is specifically, that the judges, I mean, that the police officer or investigating officer would request a copy of the driver's license and registration. In this case, when you go back to the beginning, Your Honor, and we talk about the purpose of the stop was detached. That was the purpose of the stop. So after four minutes passed and no activity, positive activity, indicating that there was an ongoing investigation that took place. I'm sorry, I'm sorry. Can I just make sure I'm, and I confess, I may have my facts wrong, but I thought that Hagler had the driver's license before the four-minute mark. He did, and if I may respond, Your Honor, he had a license before the four-minute mark and he was questioned on cross-examination. He took the license to his vehicle, which did not have a computer inside. He said at that point he called headquarters. We questioned him about that, but what did you learn from headquarters? What did you ask about and his response on the cross-examination? Okay, but so you agree that by the four-minute mark, they had gotten the driver's license from your client? Absolutely, but they didn't. I'm sorry, I just misunderstood you, my confusion. I thought you were saying they didn't get it until later. I'm sorry, go ahead. What I was indicating, Your Honor, respectfully, was that the investigation didn't begin until the four-minute mark. Yes, they did, Detective Hagler did get the license, but he didn't do anything with it. Nothing. Well, I thought you said he called headquarters. He did, Your Honor. That's what he indicated, and I would say respectfully, a careful review of his testimony would show many inconsistencies. This is what he said. He said he called, but he could not remember what he was told. This is at the hearing. He had no notes, no knowledge whatsoever that can contribute to any investigation as to the license plate on the computer. So then, as he comes back, interestingly enough, Your Honors... I just want to make sure. So I thought Hagler, and I don't have the testimony in front of me, but I thought Hagler said that he learned from headquarters that the license was not valid. It was inconsistent, Your Honor. If you read his testimony, he was all over the place, quite frankly. Did he say at J-127, I learned the valid? Judge, I don't recall him saying that and reading the testimony. I recall him saying specifically he could not recall what information he gathered from headquarters. And so once he came back to Officer Marcel, at that point, Your Honor, to Judge Diaz's point, I'm saying, Judge, if we look at the totality of the circumstances, at the four-minute mark, we are only beginning to look at the driver's license. At the eight-minute mark, which only took, if you look at the video, only took a minute and a half to determine the actual status of the defendant's license. It only took two minutes in the computer system to verify that the car was properly registered and had a holder. What we are saying here is that this was an engineered stop. This was a stop to make sure that the K-9 units could arrive in time. And to make time sufficient, the officers prolonged it. Notably, before Officer Marcel takes the license that was given to him and he's told as he gets the license, the K-9s are coming. That is another cue to take your time. Slow down. Don't move so fast. And as you can see, if you look at the video, he can actually pull up. He discovers rather quickly that the defendant had a license that was revoked. And he says no. He could have obtained a VIN number at that point and kept it there so that he can search the status of the vehicle. Judge, I think this case goes to public policy. If we allow officers to create a timeline or create a chronology of events to permit the use of K-9s, it has a chilling effect. I mean, what if we have a defendant or a person who doesn't have any narcotics or any illegal contraband in the vehicle? Most cases will never come to the court. So I think that he had, in this case, Your Honor, a number of material inconsistencies. So much so that the trial judge indicated that I had impeached, in fact, impeached Officer Marcel. I would argue, of course, to recuse Detective Hagler's testimony. I think he would know because he had a numerous amount of internal inconsistency. But then it leads to the next point, and this issue wasn't raised below. My brief, and I do acknowledge that. And that is, at the conclusion of the prolonged detention, the trial judge focused on the tolling aspect. I think in our brief, we indicated there isn't any statute or local law that provides that a car must be tolled. But the issue also became clear that an inventory search wouldn't apply. And we would also argue, even though I know this is one of our arguments, Arizona began. The whole issue of you need a search warrant. The defendant and the passenger, look at the video, they were secured on the side of the road. There was no circumstance that a search warrant could be obtained. So we would argue, Judge, that based on the totality of the circumstances, the actions of the police officers violated my client's constitutional rights. Thank you, Judge. Thank you. I think we understand your argument. You're from the government. Thank you. May it please the court. Eric Lindahl on behalf of the of Perez's motion to suppress the duration of this particular traffic stop was in no way extended for the purpose of the dog sniff. The officers, in particular, Officer Gene Marcel, worked diligently to accomplish the purposes of the traffic stop. In this case, Judge Conrad found that the officers involved did not prolong the stop. And the appellant is unable to point your record that would suggest that that finding was clearly erroneous. Mr. Lindahl, I mean, it's not often the case, as Judge Diaz here, that you're going to have direct evidence of that intent to prolong the stop. But isn't the best evidence of that the fact that these officers right from the get-go understood that they wanted a canine to show up because of the underlying suspicions regarding drugs and this car? No, Your Honor. I would submit to the court that the subjective intent behind the stop is of no bearing with respect to the legitimacy of the stop. That's a holding that's consistent in Wren that was adopted in this court in United States versus Palmer. Well, okay, let me ensure I understand that. So I don't disagree with you that the that the stop at the at its inception, the subjective evidence of what the officers may have been inclined to do or what the purpose was, it may not be relevant. But isn't it relevant to whether or not the stop was unreasonably extended? Your Honor, I would submit that there's no evidence to support that it was measurably extended. And if I'm understanding the court, the mere fact that there was a subjective intent that might have induced the stop at its outset wouldn't be support or wouldn't be evidence from which it could be inferred that there was any measurable extension to the stop. Essentially, this stop was carried out. Excuse me, I think my colleague was saying, what about the evidence, the suggestion, the evidence that has been outlined by the other side that there was evidence of intent to extend the stop to get the canines, not just to, is that relevant for us? Well, Your Honor, this circuit has not explicitly ruled as to how it may address a case where there's evidence of deliberate delay, I would submit to this court that there is no evidence from which you can infer a deliberate delay. And perhaps it would be most helpful if I speak to some of those argued delays on the part of the appellant and maybe address what came out in the government. Let me back you up. I thought what you would say to my good colleagues is not that it's irrelevant. And I can't tell exactly what you're saying, but the fact that they wanted a drug dog to show up is not irrelevant. In fact, it's probably true in every prolonged traffic stop case that we have, right? But it is not dispositive in any way, because in every case where there's a drug dog coming, somebody wants the drug dog to get there. And so we're really left with trying to evaluate whether their actions themselves did delay the stop or not. I would agree with that entirely. And I apologize if I wasn't articulating that position earlier. Because I mean, it's just too much. I mean, I don't think the government wants to say that their intent is wholly irrelevant in determining whether the stop was improperly delayed. It's just that it's not all that probative of whether their actions did delay the stop. And that's the fundamental question, is whether they did take actions that unreasonably delayed the stop. Correct, Your Honor. And I would go a step further and say that there must be some showing beyond just that subjective intent or that intent, in this case, that would be necessary to show a measurable extension for a investigative purpose that was unrelated to the traffic stop. So I would submit that that would need to be present for this court to find. Can you answer a slightly different question? I don't want to change the subject if somebody has something more on that. But what do we do with the fact that there are are assisting in the stop? So imagine the scenario where, you know, I thought that Marcel acted with reasonable dispatch in doing what he was supposed to do. But I also can say that he could have acted much quicker had he used all of the resources that were available to him at the stop, right? Because he could have said, hey, Hagler, you do this. Hey, Jones, you do that. Hey, whatever, go do this. And so by dividing up the various tasks, he could have done it in less time. Does our case law require us to evaluate the most efficient way of doing it? I mean, this is the challenge that I have when I look at these cases and I say, well, I mean, a perfectly executed stop, if we had four officers working in synchrony, could have done this quicker. But our cases don't seem to suggest that. But they don't seem to include us doing that either. What do you tell me to think about in that context? Yes, your honor, I would submit that the case law at present does not require that the stop be carried out in the fastest manner possible. Again, the cases have been very clear that these officers have to exercise reasonable diligence. And that can mean officer behavior that looks different in the same traffic stop, however, is still being executed reasonably diligently toward the purpose of that stop. So to your honor's larger question with respect to the appearance of multiple officers, I would submit that this court's opinion in United States versus Donald Hill is very informative on this point. That is a very analogous case where there were multiple officers involved, trying to accomplish the purposes of the stop, where you had one officer like Gene Marcel, who was in his patrol car, working diligently to pull up the databases that are necessary to investigate what they're investigating and complete a citation. And you had a second officer who was remaining with the defendants and the driver at the car. And the court said that was okay, that there was a safety purpose to that and also emphasize that Rodriguez doesn't require the courts to second-guess the logistical decisions that are made by law enforcement on the scene. It doesn't, in other words, require that we look and take fault with the fact that the registration wasn't requested right out of the outset. So long as these officers are working for purposes that are related to the stop and doing so with reasonable diligence, then they are complying with the Fourth Amendment up to the dog sniff. And I'll tell your Honor, too, when... Can I ask you about, Ms. Lindahl, about the issue of the registration? And I think it's your colleague on the other side who made this point, that it seems almost rote that when an officer conducts a traffic stop that he or she asks for all of the relevant documents at one time. And the fact that that didn't happen here and it seemed to occur in a piecemeal fashion suggests that there was something else afoot here. That is that the officers were trying to, you know, drag their feet in order to make sure that they took as much time as they needed to allow the drug dog to show up. But what about that kind of odd sequencing of the documents here, which is not typical in my experience? Yes, and I understand your Honor. I respectfully disagree that the absence of a request for registration right at the outset can result in an inference of a deliberate delay because the officers, again, made the logistical choice in this case to begin by investigating an incidental invest... Initiating an incidental investigation related to the stop, which was the propriety of the license. They collected the not just an expired temporary tag, but also a fictitious tag. So in a scenario like that, the evidence bore out that the VIN number... Why does that go that direction? So yeah, I want to talk to just understand what do you mean by the fake tags, right? Because if the restop was really about fake tags, then Judge Diaz's point seems even stronger, right? Because that would suggest you'd ask first for the registration, not the license plate. I mean, not the license, driver's license. There wasn't a license plate. That was the problem. Understandable. The idea being that it's going to take the vehicle identification number to confirm accurately the true owner and registration information on a car that's being operated with a fictitious tag. And the reality of a car that's occupied... All right, so stop. Help me understand why. So if I get my... And I just, I don't know these details, but if I get stopped, the way they confirm my vehicle registration is based on the license plate. And so what you're saying is, is because there were fake tags, they had to get the registration, but they ultimately were going to have to match that up to the VIN number on the front of the car. That's exactly what I'm saying, Your Honor. It's a unique circumstance with a fictitious tag investigation because you need to determine if that car is stolen and determine if it's true registration. And the only way to do that, as was borne out by the testimony, was through that vehicle identification number. It also came out... No, go ahead. I'm sorry. I thought you were through. So sorry. It also came out subsequently that Mr. Perez was unable to produce any registration paperwork. And I'll note to the court, as reflected in the body-worn camera that's been mentioned earlier, that you actually do see at the 1150 minute mark, Officer Marcel requests of another officer on scene to collect that vehicle identification number. And so that's occurring at the same time as Officer Marcel remains in his patrol car and is continuing to diligently enter information and pull up has to occur after the car has been emptied of its occupants. And that came out during the hearing as a trial safety measure. So I would submit that while the registration wasn't requested of Mr. Perez at the outset, he ultimately was unable to produce one. And the case law does bear out that the defendant's own conduct can lead to a reasonably longer duration of an investigation that's related to the stop. So here the defendant has... You have an excellent lawyer's technique of just a single breath, and you can keep on talking for 10 minutes, but I am going to interrupt you now. So we're talking, what was Marcel's basis for suspecting that the tag was false? So Your Honor, Officer Marcel testified that he had engaged in an earlier investigation where he had... Actually, it was a traffic accident where it had involved one of these Moore Automotive temporary tags from the dealership. He contacted the automotive dealership and was informed that the specific tag was not issued by that dealership. They bear striking differences. And in fact, the joint appendix includes the government's exhibit of both the tag at issue in this case and the Moore's Automotive tag, the real true tag that was issued by the dealer. So Officer Marcel was in a unique position based on his earlier investigation to immediately recognize... He testified about anything that he noticed about the Perez tag that led him to suspect it was false. And Your Honor, could you please repeat that? I'm sorry, I had trouble hearing. What he did is, I think you're correct, he said it's the only... The only basis that he said was that he had had a tag like this at some other same dealership, right? That's the only thing he said. Does he provide, does he say why there's specific details about it, this dealership that made it suspect to him? He just said he'd seen another tag from this dealership. That's correct, Your Honor. So there's nothing else? The focus was on the appearance. Is that a sufficient basis to find a reasonable suspicion for a fake tag? Your Honor, I would submit it was. He had the experience of having seen what these Moore Automotive tags are supposed to look like. And I'll also remind the court that this is an expired tag stop as well. So the temporary tag that was fictitious bore the date June 4th, and the stop occurred on June 6th. So it bore it in large lettering visible to Officer Marcel that provided a second basis. But it wasn't a fake tag, though. It was expired, right? Isn't that the evidence? Your Honor, the evidence is that it was both expired and fictitious. That's the evidence that came to light with respect to the tag. The tag on his car? The tag on the facade. Where is that? That's correct. Your Honor, it was testified to by Officer Marcel, but I'll also draw the court's attention. He specifically said it turned out that it wasn't. I think what Your Honor is referring to is that the car itself had a valid registration. It just wasn't fixed to the car, and it wasn't available in the car. So when they ran the vehicle identification number, it came back with a true owner, and it also came back with a current registration. So that was what they determined after they engaged in all of this very methodical investigation into the tag, that when they ran the VIN, it was registered to an individual that was not Mr. Perez. But a friend of his. Your Honor, there's no evidence to suggest who or how this individual is connected, but certainly it was not Mr. Perez, and it did not have any bearing on the fact that the tag that was actually on the car at the time of the stop was in fact fictitious. So that tag was fictitious, but I think that portion of the testimony might be what subsequent discovery that the car actually had a valid registration. It not only wasn't displayed, Your Honor, it wasn't available. So that is why the car was subject to be towed at that time, because there was no opportunity to make it a street legal car, so to speak, with the contents that the officers had at the scene. I believe that bears some... I'm sorry, I'm not really understanding that. I didn't understand that from the record. So try that one more time on this. Certainly, Your Honor. I thought that the officer, this is Marcel, says he thought the tag was fake, and then it turned out it wasn't. So the way the testimony came out is that he suspected the Moore's tag to be fictitious and knew it from the earlier investigation. Ultimately, at the 13-minute mark, he is able to realize by running the bin that the car was in fact registered in North Carolina, had a true owner, and a current registration. However, the officers on scene didn't have a plate that was valid that could be affixed to the car. So the Moore's automotive tag, the tag that was the basis of the stop, that was without dispute fictitious, and that has not been suggested otherwise. So I'm not an automotive expert, so tell me, when you're talking about tag, are you talking about the license plate that's on the metal thing that's on my car, or are you talking about something else? Exactly that, the plate, the vehicle's plate that's necessary to operate the street. So while the database comes back with the information about the registration, there's still no way to make that car a car you can lawfully operate because they don't have the actual tag that belongs to the Passat. I hope that answers. Well, I hear what you're saying, anyway. Thank you. And I think that the absence of the tag is relevant, as is the fact that the defendant was within minutes of the stop, it was learned that he was operating the car with a suspended license. Because at that point, as Judge Conrad found the car, it isn't going anywhere. It's subject to being towed, and so certainly... Well, the license doesn't matter because he has a friend. So if the car can be driven, the friend could drive the car. So it doesn't matter whether he had a good license to drive the car away. And Your Honor, I think that is one fact that distinguishes this case from Hill, where they were also investigating a suspended license, because it's the combination of the suspension and the fictitious tag, which mean that car is going to remain there on the side of the road until it gets towed. So that bears on the defendant's Fourth Amendment rights with respect to that car as well, because the officers aren't infringing his movement at that point. He couldn't have gotten into that car and driven away once the officers made that determination. Have you argued inevitable discovery? Your Honor, not on the basis of an inventory search. That argument is not being put forth by the government. It doesn't have to be an inventory search. I mean, it seems to me that you just made an inevitable discovery argument, right? That if the car couldn't leave because it didn't have a plate, the car was going to be there until either a plate was found or it was towed. And so no matter how long the traffic stop was delayed, the K-9 was going to show up in time, right? That's an inevitable discovery, even if you weren't going to inventory the car. It was going to be there long enough to get the K-9 there, even if the stop had ended in 60 seconds. Correct, Your Honor. That could be considered an inevitable discovery argument. I would submit... What I'm asking is, have you argued that? Your Honor, I don't know that I explicitly... I did not brief that, no, Your Honor. And I will tell the court part of that is because I also think you can characterize that, the tow, as just a part of the purpose of the stop once it's established that the tag is fictitious. And so that can be considered just as far as the overall duration for the explicit purposes of the stop. And Your Honors, I see that my time is up. I'm available if there are any other questions. Thank you. I don't think so, very much. Counsel, do you have a rebuttal? My colleague referenced repeatedly the Hill case. I just wanted to point out one of the major differences in the Hill case from the current case. And in the Hill, the officers had knowledge that the driver was involved in some robberies. And that provided an independent basis for reasonable suspicion to extend the search. So I just wanted to point that out, that Hill is not totally analogous to the facts here. With respect to the tag issue, I would just point out, and we did not raise this below. It didn't come out during testimony. And courts may take additional notice of this. But I have seen personally in my practice, clients who would write the license plate on the piece of paper, or as long as it was a valid number invisible, and drive away. And many times avoid traffic stops until they can get an actual plate from DMV. The key is the number. There wasn't such a thing here. He had written down, I don't understand where that argument goes. Well, that argument, Judge, is counsel is saying that the car couldn't be operated at all once they removed the fictitious tag. And I'm saying the car was properly registered. We had a license plate. They knew what it was. I thought you had a false license plate. There was a fictitious tag. And what happened is- Fictitious license plate. Okay, I'll say it a little different, Geronimo. There was a temporary tag, which is like your license plate, affixed to the car. The government argued that that tag had an expired date on it, and that it was fictitious, meaning that the dealer did not provide that temporary tag to that car. However, when they checked the car's VIN number, they determined that the car was actually properly registered with the Department of Motor Vehicles, and actually did have a license plate that was not, the physical license plate, that was not affixed to the car. And it was not your client's. Your client didn't own that license plate. Is that right? That's correct. He did not own that car. And there was no attempt made to- Wait, so help me understand, counsel. I'm not sure I'm following either, because I thought state law prohibited operating a vehicle without a valid tag or license plate, to the extent that those are different things. But you have to have either a license plate or a tag, and that you cannot operate a vehicle without one, and you cannot operate one with a fictitious one. Uh, Judge, I don't think you can operate a vehicle with a fictitious tag. You can't. North Carolina law is clear on that. In this case, I would argue respectfully that this car did have, this car was properly registered. But it didn't have the license plate, so it couldn't be operated. Well, I would argue that, and this didn't come out below, but I have seen clients write on a piece of paper or something like that, a license plate number, and operate a car. Wait, your argument is the guy with the fictitious license plate was going to be allowed to write another number down on the same piece of paper, and he was going to let him drive away? No, he could not do that, Judge. In this case, the appellant actually had a revoked license, so he wasn't going to be able to drive the vehicle anyway. So I'm just pointing out a scenario that could possibly have been played out. There are other scenarios, too, John. One being that they could have called the actual owner of the car. Secondly, there was questions as to whether or not the passenger was a licensed driver. But I would also argue that when we get to the inevitable argument that was not made, what is a reasonable time? What is an efficient way to conduct an investigation? Judge, we would argue that four minutes before you do anything relevant to the purpose of the important fact. And then when you look at the VIN number, Judge, I think there's New York v. Belton that said that officers can take a photograph or copy of a VIN number from outside the vehicle. Counsel's argument was that the only way the VIN number could have been obtained was if the occupants were removed from the vehicle. We would argue that number could have been obtained sooner. They could have questioned the occupant of the car. Do you to that extent? So the argument that they had to wait until the occupants were outside of the car is without merit. We would respectfully submit to the court, Judge, unless I have any questions. We thank you very much, unless my colleagues have any questions. We thank you for your arguments, and we will put the case under submission and ask the court to adjourn court for the day. Good. The assortable court stands adjourned. Senator Diagostino, United States, and assortable court.
judges: Diana Gribbon Motz, Albert Diaz, Julius N. Richardson